**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DANIEL THIELS, derivatively on behalf of SUNNOVA ENERGY INTERNATIONAL INC., | Case No.: 4:24-cv-01668 |
| Plaintiff, | |
| v. | |
| WILLIAM J. BERGER, ROBERT L. LANE, NORA MEAD BROWNELL, DOUG KIMMELMAN, C. PARK SHAPER, MARK LONGSTRETH, RAHMAN D'ARGENIO, MICHAEL C. MORGAN, ANNE SLAUGHTER ANDREW, AKBAR MOHAMED, and MARY YANG, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| SUNNOVA ENERGY INERNATIONAL INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Daniel Thiels ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Sunnova Energy International Inc. ("Sunnova" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants William J. Berger ("Berger"), Robert L. Lane ("Lane"), Nora Mead Brownell ("Brownell"), Doug Kimmelman ("Kimmelman"), C. Park Shaper ("Shaper"), Mark Longstreth ("Longstreth"), Rahman D'Argenio ("D'Argenio"), Michael C. Morgan ("Morgan"), Anne Slaughter Andrew ("Andrew"), Akbar Mohamed ("Mohamed"), and Mary Yang ("Yang") (collectively, the "Individual Defendants" and with Sunnova, "Defendants") for breaches of their fiduciary duties

1

as directors, and/or officers of Sunnova, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Berger and Lane under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sunnova, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Sunnova's directors and officers from February 25, 2020 through December 7, 2023, both dates inclusive (the "Relevant Period").

2.      Sunnova is an energy services company based in Houston, Texas that is "focused on making clean energy more accessible, reliable and affordable for homeowners and businesses," with the goal of promoting energy independence for customers through the generation and consumption of solar power. Sunnova serves more than 419,000 customers across forty-five U.S. states and territories, including Puerto Rico. The Company utilizes a dealer and contractor business model whereby Sunnova partners "with local dealers and contractors who originate, design and install solar energy systems, energy storage systems and related products and services" on the

Company's behalf. Sunnova also offers "other sustainable home solutions, such as home security and monitoring, smart home devices, modern heating, ventilation and air conditioning ("HVAC"), generators, upgraded roofing, water systems, water heaters, main panel upgrades and electric vehicle chargers."

3.     As solar energy systems involve large costs, in addition to their installation onto the roofs of customers' homes, Sunnova attracts customers by offering "energy generation savings compared to utility-based retail rates with little to no up-front expense to the customer."

4.     To this end, Sunnova's contracts with customers generally are leases, power purchase agreements ("PPA"), loans, or cash purchases. Sunnova also, in some states, facilitates customers to "obtain a new roof and/or other sustainable home products as part of their solar loan agreement or as an accessory loan to their lease or PPA." Additionally, Sunnova offers customers who are not in the market for a new solar energy system or energy storage system the opportunity to finance a new roof or other sustainable home products via a stand-alone loan from the Company. For leases and PPAs, Sunnova receives tax benefits and other incentives from the federal government, state governments, and local governments. In other words, Sunnova's business model is largely dependent upon long-term contracts with their customers.

5.     Sunnova entered into a $3.0 billion partial loan guarantee agreement ("LPO Loan") with the Loan Programs Office ("LPO") of the United States Department of Energy ("DOE") in September 2023 to facilitate Project Hestia, an initiative intended to "provide disadvantaged homeowners and communities with increased access to clean, flexible power via Sunnova services by indirectly and partially guaranteeing the cash flows associated with consumers' loans." A press release issued by the Company announcing the LPO Loan touted that Sunnova's "purpose-built

technology" was "designed to improve customer insights regarding their power usage and will facilitate demand response behavior."

6.     However, unbeknownst to shareholders and the public, Sunnova repeatedly engaged in predatory business practices including, but not limited to, pressuring elderly individuals in poor health to sign long term contracts, misleading consumers about the potential savings of installing solar panels on their homes, hiding the true costs of financing solar panels, and failing to deliver lower energy bills as promised.

7.     The truth began to emerge when the *Washington Free Beacon* published an article on November 22, 2023, titled "Biden Admin Gave $3 Billion Loan to Solar Company Accused of Scamming Elderly." The article contained information about various consumer complaints that had been filed against Sunnova for issues ranging from maintenance delays to predatory sales tactics used against elderly homeowners. Specifically, the article revealed that more than fifty consumer complaints alleging maintenance delays and predatory sales tactics had been filed with the Texas Attorney General's Office since 2022. For example, the article reported that in Texas, one of the alleged victim's children stated that her now deceased eighty-six-year-old father who suffered from dementia was persuaded by a Sunnova door-to-door salesman to sign a twenty-five-year solar panel lease in 2020. The article quoted another consumer complaint that alleged that "Sunnova used predatory lending tactics and fraud to execute a 25-year contract on an elderly woman that was dying and would never live 25 years to pay off a contract of this magnitude."

8.     The truth fully emerged when U.S. Representative Cathy McMorris Rodgers of Washington, Chair of the U.S. House Committee on Energy and Commerce, and Senator John Barrasso of Wyoming, ranking member of the U.S. Senate Committee on Energy and Natural Resources, sent a letter to the DOE and Sunnova on December 8, 2023, requesting information

pertaining to Project Hestia and the LPO Loan. The letter was sent following the release of "disturbing" reports regarding the Company, specifically seeking additional information regarding the LPO's awareness of and treatment of Sunnova's allegedly predatory business practices. The letter further stated that "We are alarmed about recent, credible reports that Sunnova has racked up numerous consumer complaints, including those alleging troubling sales practices, such as Sunnova pressing elderly homeowners in poor health to sign long-term contracts costing tens of thousands of dollars."

9.      The letter further revealed that "additional reports suggest these troubling reports are not isolated incidents. For example, while Project Hestia will target Puerto Rican homeowners for 20 percent of its loans, its residents have previously experienced major problems with Sunnova's services there." Indeed, by 2017, Puerto Rico's Independent Office of Consumer Protection reportedly received over 1,000 complaints regarding Sunnova systems that include claims of misleading consumers and failing to deliver lower energy bills as promised. In 2019, the Puerto Rican Energy Bureau also released a report confirming the validity of numerous consumer complaints it received. These included complaints of consumers accidentally signing up for 25-year contracts, consumers being misled about potential savings with solar panels, and Sunnova not fully revealing the costs of financing these solar panels to consumers.

10.     On this news, the Company's share price dropped $2.00 per share, or 16.12%, from its December 7, 2023 closing price of $12.41 per share to close on December 8, 2023 at $10.41 per share.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and

prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Project Hestia's intended beneficiaries—disadvantaged homeowners and communities—were victims of the Company's predatory business practices; (2) Sunnova did not have sufficient or effective risk management or compliance controls and procedures in place; (3) as a result, Sunnova faced an elevated risk of regulatory, civil, and other oversight investigations; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

12.     Moreover, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact while four of the Individual Defendants engaged in insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements, reaping personal profits ***exceeding $30 million***. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chairman of the Board of Directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Texas (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due

to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

## PARTIES

### Plaintiff

20.     Plaintiff Thiels is a current shareholder of Sunnova.  Plaintiff has continuously held Sunnova common stock since purchasing it on July 10, 2020.

### Nominal Defendant Sunnova

21.     Sunnova is a Delaware corporation with its principal executive offices at 20 East Greenway Plaza, Suite 540, Houston, TX, 77046. Sunnova's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "NOVA."

### Defendant Berger

22.     Defendant Berger founded the Company in 2012. Since then, he has served as the Company's CEO, President, and Chairman of the Board. Defendant Berger has served as a Company director since April 2019. According to the Company's Schedule 14A filed with the SEC on April 4, 2024 (the "2024 Proxy Statement"), as of March 11, 2024, Defendant Berger beneficially owned 2,340,381 shares of the Company's common stock, representing 1.9% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Berger owned approximately $12.4 million worth of Sunnova stock as of that date.

23.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Berger received $1,593,926 in total compensation from the Company, including $450,000 in salary, $863,172 in stock awards, $269,354 in non-equity incentive plan compensation, and $11,400 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Berger received $1,465,350 in total compensation from the Company, including $450,000 in salary, $500,000 in stock awards, $500,000 in non-equity incentive plan compensation, and $15,350 in all other compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Berger received 5,358,001 in total compensation from the Company, including $520,833 in salary, $368,095 in stock awards, $4,000,000 in option awards, $449,893 in non-equity incentive plan compensation, and $19,180 in all other compensation. For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Berger received $5,865,040 in total compensation from the Company, including $620,833 in salary, $489,645 in stock awards, $4,000,000 in option awards, $734,468 in non-equity incentive plan compensation, and $20,094 in all other compensation.

24.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Berger made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 8/2/2021 | 47,432 | $37.12 | $1,760,913 |
| 3/14/2022 | 9,300 | $22.08 | $205,343 |
| 8/1/2022 | 49,656 | $24.67 | $1,225,162 |
| 8/8/2022 | 150,000 | $30.04 | $4,506,600 |
| 3/22/2023 | 10,385 | $14.04 | $145,805 |
| 8/01/2023 | 47,150 | $17.86 | $842,004 |

Thus, in total, before the fraud was exposed, he sold 313,923 shares of Company stock on inside information, for which he received approximately $8,685,827 in proceeds. His insider sales, made

with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

25.     The 2024 Proxy Statement stated the following about Defendant Berger:

*William J. (John) Berger* has served on our Board since April 1, 2019. Mr. Berger founded Sunnova Energy Corporation in 2012 and has since then served as Chief Executive Officer, President and Chairman of the Board. With more than two decades of experience in the electric power industry, Mr. Berger is an energy entrepreneur who has always supported free market competition, consumer choice and the advancement of energy technology to power energy independence. Before Sunnova, Mr. Berger served as Founder and Chief Executive Officer at SunCap Financial, a residential solar service provider. He also founded Standard Renewable Energy, a provider and installer of renewable energy and energy-efficient products and services. Mr. Berger received his Master of Business Administration from Harvard Business School and graduated cum laude from Texas A&M University with a Bachelor of Science degree in civil engineering.

**Defendant Lane**

26.     Defendant Lane has served as the Company's CFO and Executive Vice President since May 2019. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Lane beneficially owned 176,860 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Lane owned approximately $942,663 worth of Sunnova stock as of that date.

27.     For the 2020 Fiscal Year, Defendant Lane received $1,653,098 in total compensation from the Company, including $350,000 in salary, $1,242,232 in stock awards, $49,364 in non-equity incentive plan compensation, and $11,502 in all other compensation. For the 2021 Fiscal Year, Defendant Lane received $1,800,106 in total compensation from the Company, including $363,542 in salary, $952,032 in stock awards, $240,625 in option awards, $230,157 in non-equity incentive plan compensation, and $13,750 in all other compensation. For the 2022 Fiscal Year, Defendant Lane received $2,152,358 in total compensation from the Company, including $392,708 in salary, $858,852 in stock awards, $725,000 in option awards,

$163,598 in non-equity incentive plan compensation, and $12,200 in all other compensation. For the 2023 Fiscal Year, Defendant Lane received $2,359,850 in total compensation from the Company, including $400,000 in salary, $938,660 in stock awards, $800,000 in option awards, $207,990 in non-equity incentive plan compensation, and $13,200 in all other compensation.

28.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lane made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 8/2/2021 | 8,300 | $37.12 | $308,137 |
| 3/14/2022 | 11,870 | $21.95 | $260,510 |
| 3/16/2022 | 4,051 | $23.39 | $94,752 |
| 3/23/2022 | 1,850 | $25.05 | $46,342 |
| 8/1/2022 | 8,690 | $24.60 | $213,774 |
| 3/22/2023 | 14,015 | $14.00 | $196,210 |
| 3/23/2023 | 4,815 | $13.51 | $65,050 |

Thus, in total, before the fraud was exposed, he sold 53,591 shares of Company stock on inside information, for which he received approximately $1,184,775 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

29.     The 2024 Proxy Statement stated the following about Defendant Lane:

*Robert L. Lane* joined Sunnova Energy Corporation in May 2019 as Executive Vice President, Chief Financial Officer and was elected as one of Sunnova Energy International Inc.'s executive officers on July 10, 2019. Prior to joining Sunnova, Mr. Lane served as Vice President and Chief Financial Officer of Spark Energy, Inc., a publicly traded retail energy services company, from June 2016 to April 2019. Mr. Lane previously served as the Chief Financial Officer of Emerge Energy Services GP, LLC, the general partner of Emerge Energy Services LP, from November 2012 to June 2015. Prior to joining Emerge, Mr. Lane was an investment banker and equity research analyst covering the energy industry. Mr. Lane is a Certified Public Accountant and a Chartered Financial Analyst. Mr. Lane received his Master of Business Administration from the University of Pennsylvania's Wharton School and his Bachelor of Arts degree from Princeton University. He

also received a Certificate in the Accountancy Program from the B.T. Bauer School of Business at the University of Houston.

**Defendant Brownell**

30.     Defendant Brownell has served as a Company director since October 2020. Defendant Brownell also serves as the Chair of the Compensation and Human Capital Committee and as a member of the Nominating, Corporate Governance and Sustainability Committee. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Brownell beneficially owned 35,299 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Brownell owned approximately $188,143 worth of Sunnova stock as of that date.

31.     For the 2020 Fiscal Year, Defendant Brownell received $135,000 in total compensation from the Company, including $15,000 in fees earned or paid in cash, and $120,000 in stock awards. For the 2021 Fiscal Year, Defendant Brownell received $189,321 in total compensation from the Company, including $187,500 in stock awards, and $1,821 in all other compensation. For the 2022 Fiscal Year, Defendant Brownell received $202,704 in total compensation from the Company, including $5,445 in fees earned or paid in cash, $187,500 in stock awards, $9,759 in all other compensation. For the 2023 Fiscal Year, Defendant Brownell received $215,079 in total compensation from the Company, including $200,000 in stock awards, and $15,079 in all other compensation.

32.     The Company's website stated the following about Defendant Brownell:

Ms. Brownell is an accomplished executive and entrepreneur. Since 2009, Ms. Brownell has served as a co-founder and principal of Espy Energy Solutions LLC, an energy consulting group that provides strategic planning, marketing, business planning, and other consulting services to energy utilities, equipment manufacturers, service providers and financial institutions evaluating energy investments.

Ms. Brownell is also currently a director of the Morgan Stanley Infrastructure Advisory Board, where she has served since June 2014 and of Mead Family Investments (previously Times Publishing Co.), where she has served since 1996. Ms. Brownell is a former Commissioner of the Federal Energy Regulatory Commission where she served a term from May 2001 to June 2006, and a former member of the Pennsylvania Public Utility Commission where she served from 1997 until 2001. Ms. Brownell's prior public company board service includes: PG&E Corporation from April 2019 until June 2020, where she served as Chair of the board of directors; National Grid PLC from June 2012 until April 2019 where she served on the Remunerations, Nominations, Safety and Environment and Health committees; and Spectra Energy Partners, LP from May 2007 until November 2018, where she served on the Audit and Conflicts committees.

Ms. Brownell attended Syracuse University.

**Defendant Kimmelman**

33.     Defendant Kimmelman served as a Company director from June 2019 to December 2023. Defendant D'Argenio is a partner at Energy Capital Partners, and, per stock ownership, owns 5.6% of the Company. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Kimmelman, through being partner at Energy Capital Partners, beneficially owned 6,911,664 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Kimmelman owned approximately $36 million worth of Sunnova stock as of that date.

34.     The 2021 Proxy Statement stated the following about Defendant Kimmelman:

*Doug Kimmelman* was appointed to the board of directors of Sunnova Energy Corporation in March 2016 and was appointed to our Board in June 2019. Mr. Kimmelman was appointed in connection with his affiliation with ECP, which he established in April 2005 and where he serves as its Senior Partner. Mr. Kimmelman also currently serves on the boards of directors of Calpine Corporation, US Development Group, LLC, USD Partners GP, LLC, USD Partners, LP, and Nesco Holdings LP. Prior to realization, he served on the board of CE2 Carbon Capital, LLC. He is a member of ECP's Management Committee and Investment Committee. Prior to founding ECP, Mr. Kimmelman spent 22 years with Goldman Sachs, starting in 1983 in the firm's Pipeline and Utilities Department within the Investment Banking Division. He was named a General Partner of Goldman Sachs in 1996 and remained exclusively focused on the energy and utility sectors in the Investment Banking Division until 2002 when he

transferred to Goldman Sach's J. Aron commodity group to help form a new business for the firm in being an intermediary in electricity trading markets. Mr. Kimmelman was instrumental in developing the Constellation Power Source concept as the initial entry point for Goldman Sachs as a principal into electricity markets. Mr. Kimmelman also played a leadership role at Goldman Sachs in building a principal investing business in power generation and related energy assets. Mr. Kimmelman received his Bachelor of Arts degree in Economics from Stanford University and his Master of Business Administration from the Wharton School at the University of Pennsylvania.

**Defendant Shaper**

35.     Defendant Shaper has served as a Company director since June 2019. Defendant Shaper also serves as the Chair of the Audit Committee. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Shaper beneficially owned 1,297,193 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Shaper owned approximately $6.9 million worth of Sunnova stock as of that date.

36.     For the 2021 Fiscal Year, Defendant Shaper received $205,000 in total compensation from the Company, including $85,000 in fees earned or paid in cash, and $120,000 in stock awards. For the 2022 Fiscal Year, Defendant Shaper received $205,000 in total compensation from the Company, including $85,000 in fees earned or paid in cash, and $120,000 in stock awards. For the 2023 Fiscal Year, Defendant Shaper received $199,456 in total compensation from the Company, including $79,456 in fees earned or paid in cash, and $120,000 in stock awards.

37.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Shaper made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 9/23/2020 | 71,714 | $26.25 | $1,882,851 |

| 9/24/2020 | 74,447 | $25.86 | $1,925,199 |
| 9/25/2020 | 53,839 | $26.18 | $1,409,774 |
| 9/28/2020 | 82,283 | $27.73 | $2,281,296 |
| 9/30/2020 | 217,717 | $29.10 | $6,336,217 |

Thus, in total, before the fraud was exposed, he sold 500,000 shares of Company stock on inside information, for which he received approximately $13,835,337 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

38. The Company's website stated the following about Defendant Shaper:

C. Park Shaper is the chief executive officer of Seis Holdings, LLC. Seis is a private investment holding company seeking opportunities to take meaningful equity positions in cash flow-generating, private businesses. In addition to serving on the Sunnova board of directors, he serves on the board of Kinder Morgan, Inc., the largest midstream company and the third-largest energy company in North America (based on combined enterprise value).

Shaper previously served as president and member of the office of the chairman of Kinder Morgan. He joined Kinder Morgan in 2000 as vice president and chief financial officer. He was named to the office of the chairman in 2003, and held the titles of executive vice president in 2004 and president in 2005. He stepped down as an officer of the entities in March 2013. Shaper was instrumental in spearheading the company's transparent financial reporting and communication to the investment community.

Prior to joining Kinder Morgan, he was president and director of Altair Corporation, an enterprise focused on the distribution of web-based investment research for the financial services industry. He also served as vice president and chief financial officer for Data Analytics, and was a consultant for The Boston Consulting Group, as well as the Strategic Services Division of Andersen Consulting.

Shaper holds bachelor's degrees in industrial engineering and quantitative economics from Stanford University. He also earned an MBA from the J.L. Kellogg Graduate School of Management at Northwestern University. He is the trust manager for Weingarten Realty Trust and is also active in the Houston community, sitting on the board of directors of Texas Children's Hospital, the Alley Theatre, the Children's Museum of Houston and Genesys Works.

**Defendant Longstreth**

39.     Defendant Longstreth has served as a Company director since June 2019. Defendant Longstreth also serves as a member of the Audit Committee and as a member of the Nominating, Corporate Governance and Sustainability Committee. Defendant Longstreth is a partner at Newlight Partners LP, a private equity firm that owns 5.3% of the Company. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Longstreth, through his control of Newlight Partners LP, beneficially owned 6,505,811 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Longstreth owned approximately $34 million worth of Sunnova stock as of that date.

40.     The Company's website stated the following about Defendant Longstreth:

Mr. Longstreth was appointed to Sunnova's board in March 2018. Mr. Longstreth was appointed in connection with his affiliation with Newlight Partners, LP, a growth-focused private equity firm. Mr. Longstreth is a Partner at Newlight, where he leads Newlight's investment activity in the power and energy sectors. Mark has been with Newlight Partners and its predecessor, the Strategic Investments Group of Soros Fund Management, since 2007, where he served as Managing Director prior to joining Newlight upon its founding in 2018. Mr. Longstreth also currently serves on the boards of BayoTech Holdings LLC, Bioenergy Development Group LLC, Leyline Renewable Capital LLC, and Alternative Resource Group LLC. Prior to that, Mr. Longstreth worked in Investment Banking at Bear Stearns & Co. Mr. Longstreth received his Bachelor of Science in Foreign Service in International Economics from Georgetown University in 2004.

**Defendant D'Argenio**

41.     Defendant D'Argenio served as a Company director since June 2019. Defendant D'Argenio also serves as a member of the Compensation and Human Capital Committee. Defendant D'Argenio is a partner at Energy Capital Partners, an entity that owns 5.6% of the Company. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant D'Argenio, through his control of Energy Capital Partners, beneficially owned 6,911,664 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on March 11, 2024 was $5.33, Defendant D'Argenio owned approximately $36 million worth of Sunnova stock as of that date.

42.     The Company's website stated the following about Defendant D'Argenio:

Mr. D'Argenio is a Partner at Energy Capital Partners. He is involved in all areas of the firm's investment activities, with particular emphasis on fossil and renewable power generation and energy related services and manufacturing.  Mr. D'Argenio currently serves on the boards of NESCO Holdings LP, PLH Group, Inc, and Sunnova Energy Corporation.

Prior to joining Energy Capital in 2010, Mr. D'Argenio spent seven years at First Reserve Corporation, an international energy-focused private equity firm based in Greenwich, Connecticut. His responsibilities at First Reserve included a leadership role in power, financial services and coal related investments. Prior to that, Mr. D'Argenio worked in the Energy & Utilities Investment Banking Group at Deutsche Bank Securities. Mr. D'Argenio began his career in the structured finance group at Sempra Energy Trading.

Mr. D'Argenio received a B.A. in Mathematics and Economics from the University of Pennsylvania.

**Defendant Morgan**

43.     Defendant Morgan has served as a Company director since June 2019. Defendant Morgan also serves as a member of the Compensation and Human Capital Committee. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Morgan beneficially owned 385,243 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Morgan owned approximately $2 million worth of Sunnova stock as of that date.

44.     For the 2021 Fiscal Year, Defendant Morgan received $197,500 in total compensation from the Company, including $77,500 in fees earned or paid in cash, and $120,000 in stock awards. For the 2022 Fiscal year, Defendant Morgan received $201,056 in total compensation from the Company, including $77,500 in fees earned or paid in cash, $120,000 in stock awards, and $3,556 in all other compensation. For the 2023 Fiscal Year, Defendant Morgan

received $186,411 in total compensation from the Company, including $66,411 in fees earned or paid in cash, and $120,000 in stock awards.

45.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Morgan made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| 12/7/2020 | 100,000 | $38.82 | $3,882,000 |
| 10/20/2021 | 31,868 | $40.81 | $1,300,533 |
| 10/28/2021 | 30,000 | $44.33 | $1,329,900 |

Thus, in total, before the fraud was exposed, he sold 161,868 shares of Company stock on inside information, for which he received approximately $6,512,433 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

46.     The Company's website stated the following about Defendant Morgan:

Michael C. Morgan is a co-founding partner of Triangle Peak Partners, LP, and serves as its chairman and chief executive officer. Since 2004, he has been the president and chief executive officer of Portcullis Partners, LP, a private investment partnership and one of Triangle Peak's largest limited partners.

Morgan also serves as the lead director of Kinder Morgan, Inc. (KMI), the largest energy infrastructure company in North America, which operates or owns an interest in over 80,000 miles of pipelines and 180 terminals. He joined Kinder Morgan when it was founded in early 1997 and headed its corporate development efforts until 2001, completing 23 acquisitions worth over $5 billion and later serving as company president until 2004.

He has represented Triangle Peak Partners on the boards of Bunchball, Lytx and SCIenergy. He is a frequent volunteer at Stanford University, currently serving on the GSB Management Board, the Precourt Energy Institute, the DAPER Fund and several ad hoc committees. Morgan previously served on the boards of two public energy funds affiliated with Kayne Anderson (NYSE: KYN and KYE and was an adjunct professor in the practice of management at the Jones Graduate School of Management at Rice University.

Morgan received a bachelor's degree in economics and a master's degree in sociology from Stanford University. He later earned his MBA from Harvard Business School

**Defendant Andrew**

47.    Defendant Andrew has served as a Company director since October 2019. Defendant Andrew also serves as Chair of the Nominating, Corporate Governance, and Sustainability Committee. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Andrew beneficially owned 71,995 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Andrew owned approximately $383,733 worth of Sunnova stock as of that date.

48.    For the 2020 Fiscal Year, Defendant Andrew received $176,342 in total compensation from the Company, including $30,000 in fees earned or paid in cash, $145,000 in stock awards, and $1,342 in all other compensation. For the 2021 Fiscal Year, Defendant Andrew received $196,259 in total compensation from the Company, including $192,500 in stock awards, and $3,759 in all other compensation. For the 2022 Fiscal Year, Defendant Andrew received $195,876 in total compensation from the Company, including $192,500 in stock awards, and $3,376 in all other compensation. For the 2023 Fiscal Year, Defendant Andrew received $206,948 in total compensation from the Company, including $205,363 in stock awards, and $1,585 in all other Compensation.

49.    The Company's website stated the following about Defendant Andrew:

Former U.S. Ambassador Andrew is a mission-driven entrepreneur, executive, and lawyer whose career has centered on advancing strategic initiatives and businesses that deliver sustainable outcomes. She served as our U.S. Ambassador in Costa Rica under President Obama (2010-2013), leading an Embassy of more than 300 staff and 10 federal agencies. Before her public service, former Ambassador Andrew spent more than 20 years as an Energy and Environmental Attorney leading national initiatives addressing brownfields and clean air programs through stakeholder engagement. In addition, Ms. Andrew launched a sustainable

agricultural venture and was a co-founder of a national clean tech policy organization. Ms. Andrew now serves on the Board of several clean-energy start-ups and of a leading solar energy company, Sunnova Energy International, Inc. (NOVA), advising on the launch of its ESG initiative. Through the work of her consulting company WindRun Strategies, she is investing, advising and advocating for initiatives that advance a more inclusive clean energy economy, including the 2020 launch of the NewDEAL Forum's Climate Solutions Report for State and Local Policymakers. Former Amb. Andrew also serves on the Board and Executive Committee of the Natural Resources Defense Council, and the Telluride Foundation in Telluride, Colorado. Ms. Andrew holds a B.A. degree from Georgetown University and received her J.D. from Indiana University McKinney School of Law, which recently awarded her the Bicentennial Medal for distinguished service.

**Defendant Mohamed**

50.     Defendant Mohamed has served as a Company director since December 2020. Defendant Mohamed also serves as a member of the Nominating, Corporate Governance, and Sustainability Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Mohamed beneficially owned 248,433 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Mohamed owned approximately $1.3 million worth of Sunnova stock as of that date.

51.     For the 2020 Fiscal Year, Defendant Mohamed received $120,000 in total compensation from the Company, including $120,000 in stock awards. For the 2021 Fiscal Year, Defendant Mohamed received $190,000 in total compensation from the Company, including $190,000 in stock awards. For the 2022 Fiscal Year, Defendant Mohamed received $193,555 in total compensation from the Company, including $2,178 in fees earned or paid in cash, $190,000 in stock awards, and $1,377 in all other compensation. For the 2023 Fiscal Year, Defendant Mohamed received $197,113 in total compensation from the Company, including $195,000 in stock awards, and $2,113 in all other Compensation.

52.     The Company's website stated the following about Defendant Mohamed:

Mr. Mohamed was appointed to Sunnova's board in December 2020. As an accomplished executive with over 20 years of experience in retail and wireless technology, Mr. Mohamed has served as the President of Prime Communications, the largest AT&T authorized retailer in the United States, since 2010. Mr. Mohamed oversees sales leadership and retail distribution, and drives Prime's growth strategy, which has included several recent large acquisitions effectively increasing the footprint from 700 stores in 2018 to over 2,000 as of December 1st, 2021. Additionally, Mr. Mohamed established and serves as Chairman of Prime's retail subsidiary brands, including Prime Canada, the largest Rogers' Wireless authorized retailer with approximately 50 retail stores in Canada; Prime Wireless Holdings, AT&T's largest operator in Mexico with over 270 retail stores; and Sun Com, a Cricket Wireless authorized retailer with 250 retail stores in the southeastern United States. Outside of Prime, Mr. Mohamed's entrepreneurial spirit has led him to found numerous successful companies including GamesPlus, Prepaid Works, and Wireless Works. Through his family office – Jumana Capital, he is also an active investor in operating businesses, real estate, private equity, and venture capital funds. In addition, Mr. Mohamed serves as a Board of Trustee and Chairman for Awty International school, and previously served on the Aga Khan Economic Planning Board as a national member and chairman of Nizari Credit Union. He is also an active member of the Houston Young Presidents Organization (YPO), where he serves as a member of the Executive Board. Prior to joining Prime, Mr. Mohamed served as an investment professional at Hicks Muse, a private equity firm in Dallas, and as a merger and acquisitions professional at Goldman Sachs, a global investment bank in New York. Mr. Mohamed received his Bachelor of Science degree in accounting and finance, summa cum laude, from the University of Illinois at Urbana-Champaign and is a Certified Public Accountant.

**Defendant Yang**

53.     Defendant Yang has served as a Company director since October 2021. Defendant Yang also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 11, 2024, Defendant Yang beneficially owned 17,857 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2024 was $5.33, Defendant Yang owned approximately $95,177 worth of Sunnova stock as of that date.

54.     For the 2021 Fiscal Year, Defendant Yang received $120,000 in total compensation from the Company, including $120,000 in stock awards. For the 2022 Fiscal Year, Defendant Yang received $196,679 in total compensation from the Company, including $70,000 in fees earned or

paid in cash, $120,000 in stock awards, and $6,679 in all other compensation. For the 2023 Fiscal

Year, Defendant Yang received $192,342 in total compensation from the Company, including

$70,000 in fees earned or paid in cash, $120,000 in stock awards, and $2,342 in all other

compensation.

55.     The Company's website stated the following about Defendant Yang:

Ms. Yang has more than 25 years of experience in technology through a career
focused on advising companies on strategic investments, alliance opportunities and
global M&A activity. Ms. Yang currently serves as Senior Vice President and Chief
Strategy Officer of Ciena Corporation, a networking systems, services and software
company, a position she has held since April 2020. Prior to joining Ciena, she
served as Vice President of Corporate Development/Business Development at NIO
Inc., a leader in the design and development of smart, high-performance electric
vehicles from February 2016 to April 2020.

Previously, Ms. Yang served as Vice President of Corporate Development and
Strategic Alliances at Fortinet, Inc., a global leader in cybersecurity solutions, from
July 2014 to February 2016. In addition, she previously held senior leadership roles
in strategy and corporate development at leading communications companies,
including Cisco Systems, Inc. and Nortel Networks Limited.

Ms. Yang holds several academic degrees from Stanford University, including a
Juris Doctorate, Master of Business Administration, Master of Science in
Management Science and Engineering, and Bachelor of Arts in Quantitative
Economics.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers, directors, and/or fiduciaries of Sunnova and

because of their ability to control the business and corporate affairs of Sunnova, the Individual

Defendants owed Sunnova and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Sunnova

in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

act in furtherance of the best interests of Sunnova and its shareholders so as to benefit all

shareholders equally.

57. Each director and officer of the Company owes to Sunnova and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sunnova, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59. To discharge their duties, the officers and directors of Sunnova were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sunnova, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Sunnova's Board at all relevant times.

61. As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

62.     To discharge their duties, the officers and directors of Sunnova were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sunnova were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Sunnova's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Sunnova conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Sunnova and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sunnova's operations would comply with all applicable laws and Sunnova's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to Sunnova and the shareholders the duty of loyalty requiring that each favor Sunnova's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

64.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Sunnova and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, directorial, and controlling positions with Sunnova, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sunnova.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants who is a director of Sunnova was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sunnova, and was at all times acting within the course and scope of such agency.

### SUNNOVA'S CODE OF CONDUCT

*Sunnova's Code of Conduct*

72.     Sunnova's Code of Conduct states, "the purpose of our Code of Conduct is to convey the principles of ethical business conduct expected of all our employees and those who represent Sunnova Energy International Inc., and its subsidiaries." The Code of Conduct states "the Company, its employees, and all parties with whom it transacts business are expected to comply with all laws, rules, and regulations applicable to the Company's activities." The Code of Conduct further states "the Company is committed to conducting investigations of alleged violations of the Code and taking appropriate corrective action where violations are found to have occurred."

73.     Under the section titled "We Respect Records Retention, Disclosures, and Data Privacy," the Sunnova Code of Conduct provides:

The Company is committed to the accurate management and retention of its business records to properly manage decisions and to fulfill the Company's financial, legal, and reporting obligations. All of the Company's records must be complete, timely, accurate and reliable in all material respects. All transactions must be properly documented and accounted for on the books and records of the Company, and no off-book funds or transactions are permitted.

When required to report data externally, the data must be verified internally as accurate before submitting. No tolerance is allowed for falsifying or not verifying regulatory, tax, or other compliance data.

All reports, vouchers, bills, invoices, payroll, business measurement and performance records, and other essential data must be prepared and maintained with care and honesty. No such data may be falsified or altered to conceal or distort assets, liabilities, revenues, expenses, or performance results.

74.     Regarding "Reporting Violations," the Sunnova Code of Conduct provides, in relevant part:

Employees have a responsibility to report any conduct that appears to be unethical or illegal or that appears to violate our Code, our other policies or applicable laws and regulations. Reports should be made immediately either anonymously via our Hotline, an anonymous and confidential incident reporting system hosted by a third-party service, or confidentially through our General Counsel.

75.     Under the section "Legal and Regulatory Compliance," the Sunnova Code of Conduct provides, in relevant part:

All officers and employees must seek to comply with all applicable laws and regulations. All employees, officers, and representatives of the Company are expected to consult with internal subject matter experts on compliance questions and to consult with the Company's legal department where appropriate concerning such matters.

76.     Regarding "Insider Trading," the Sunnova Code of Conduct provides, in relevant part:

It is a violation of law to pass material non-public information, commonly referred to as "inside information," on to others or to buy or sell securities to take advantage of inside information. Trading in securities of the Company, including within any 401(k) plan or IRA or other entity, tipping others who may engage in such trading while the employee has material non-public information about the Company or other entity, and other inappropriate uses of the Company's nonpublic information

violates our Code and is illegal. Such trading may result in civil penalties of up to three times the profit made or loss avoided on the trade, and/or criminal penalties including fines and imprisonment, and is also a violation of our Code.

77.     Regarding "Disclosures and Waivers" of the Sunnova Code of Conduct provides,

in relevant part:

If you confront an exceptional situation or circumstance that you believe is not anticipated or fully addressed by the guidance contained in this Code of Conduct or in any other Company policy, the situation must be raised through the General Counsel who will review in turn with the Chief Executive Officer as applicable.

Violations of law may subject employees and the Company to civil and criminal penalties. Thus, waivers of any requirement of our Code will only be granted in exceptional circumstances, after disclosure through the General Counsel and careful consideration followed by an appropriate review by the Chief Executive Officer and as appropriate in certain cases, the Audit Committee of the Company's Board of Directors or the full Board.

### *Code of Ethics for the CEO and Senior Financial Officers*

78.     Sunnova's Code of Ethics for the CEO and Senior Financial Officers ("Sunnova's

Code of Ethics") applies to the:

Chief Executive Officer, the Chief Financial Officer (or other principal financial officer), Chief Accounting Officer (or other principal accounting officer), the Controller and other senior financial officers (collectively, the "Officers") of Sunnova Energy International Inc. and its subsidiaries (collectively, the "Company").  Our Officers hold important and elevated roles in the corporate governance of the Company and are vested with both the responsibility and authority to protect, balance and preserve the interests of the Company, including the interests of shareholders, clients, employees, vendors and citizens of the communities in which the Company conducts business.

79.     Under the section "Honest and Ethical Conduct," Sunnova's Code of Ethics states

the following:

Each Officer must act with the highest standards of honest and ethical conduct in fulfilling his or her duties and responsibilities, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

80.    In violation of the Sunnova Code of Conduct and Sunnova Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets, and abuse of control. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading. In violation of Sunnova's Code of Conduct and Sunnova's Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

*Audit Committee Charter*

81.    The Company's Audit Committee Charter states that the "purposes" of the Audit Committee are to:

> Assist the Board with oversight of: the quality and integrity of the Company's financial statements; compliance with legal and regulatory requirements; the review of the Company's independent registered auditors' qualifications and independence; the review of the performance of the Company's independent registered auditors and internal audit function; the design and implementation of the Company's internal audit function; risks relating to financial matters, financial reporting and auditing, the corporate ethics and compliance program, and cybersecurity; and the Company's enterprise risk management ("ERM") process.

> The primary role of the Committee is to oversee the financial reporting and disclosure process. To fulfill this obligation, the Committee relies on: management for the preparation and accuracy of the Company's financial statements; both management and the Company's internal audit department for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit

or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls. The members of the Committee are not employees of the Company and are not responsible for conducting the audit or performing other accounting procedures.

82.     The Audit Committee Charter also describes the Audit Committee's responsibilities. The Audit Committee Charter states that the Audit Committee shall have the following authority and responsibilities:

Financial Reporting

To review with management, the internal audit department and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes and internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures, and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures.

To review and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the auditors on the financial statements and disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed and recommend to the Board whether the Company's annual audited financial statements and accompanying notes should be included in the Form 10-K.

To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed.

To prepare and approve the Committee's report as required by the Securities and Exchange Commission to be included in the Company's proxy statement for the annual stockholders meeting (or in the Company's Annual Report on Form 10-K if required to be included therein).

To review and discuss with management the Company's earnings press releases, as well as financial information and earnings guidance provided to investors, analysts or rating agencies.

83.     Regarding the Company's "Compliance and Risk Management," the Audit Committer Charter provides:

> To establish and oversee procedures for the receipt, retention and effective handling of complaints received by the Company regarding financial, accounting, internal controls or auditing matters or violations of law, company policy, and unethical business practices; to ensure that the complaint reporting process and procedures reasonably protect the ability of reporters to submit  confidential, anonymous reports and be free from retaliation based on a good faith report or by reason of cooperation with the Company's investigation of such complaints; and, to ensure timely consultation with and input from the Committee on serious issues, establish a list of the allegations and compliance issue types requiring immediate and continuing notification of the Committee Chair.

> To oversee and monitor the strategy, resources and effectiveness of the Company's program to achieve compliance with applicable laws and regulations and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal, ethical and regulatory compliance; to establish a regular reporting cadence for the Company to provide reports on the effectiveness of the compliance program and key controls;; and to review and approve the hiring or dismissal of any Chief Compliance Officer.

> To oversee and ensure that management has established an ERM process reasonably designed and implemented to reliably identify and assess the critical risks and opportunities facing the Company; to ensure that the risk identification and assessment process incorporates not only potential risks to the Company's strategy, operations, compliance with law and financial performance but also the material risks posed through adverse impact on the Company's stakeholders; and to actively monitor the effectiveness of the Company in mitigating critical and material risks to the Company and its key stakeholders, except as to those risks for which oversight has been assigned to other committees of the Board.

> To review with management the effectiveness of (a) the Company's cyber security frameworks, policies, programs, opportunities, and risk profile; and (b) the Company's business continuity and disaster recovery plans and capabilities and the effectiveness of the Company's escalation procedures.

> To review, with the General Counsel and outside legal counsel, legal and regulatory matters not otherwise overseen by the Board or another committee, including legal cases against or regulatory investigations of the Company and its subsidiaries, that could have a significant impact on the Company and its stakeholders or on the Company's financial statements, internal controls or compliance policies or programs.

84.     In violation of the Audit Committee Charter, the Individual Defendants sitting on the Audit Committee during the Relevant Period failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Sunnova Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

85.     Sunnova is a tech based solar energy corporation based in Houston, Texas that provides energy services through its adaptive energy platform. Sunnova installs energy systems and other sustainable home solutions to improve the energy efficiency and sustainability of their customers' homes and businesses.

86.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Project Hestia's intended beneficiaries—disadvantaged homeowners and communities—were victims of the Company's predatory business practices; (2) Sunnova did not have sufficient or effective risk management or compliance controls and procedures in place; (3) as a result, Sunnova faced an elevated risk of regulatory, civil, and other oversight investigations; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable

basis at all relevant times.

## False and Misleading Statements

### *February 25, 2020 Annual Report*

87.     On February 25, 2020, Sunnova filed its annual report for the fiscal year ended December 31, 2019 (the "2019 Fiscal Year") on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants Berger, Lane, Andrew, D'Argenio, Morgan, Shaper, Longstreth, and Kimmelman and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Berger and Lane, attesting to the accuracy of the financial statements contained in the 2019 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

88.     The 2019 10-K provided a summary of the Company, in relevant part:

We are a leading residential solar and energy storage service provider, serving more than 80,000 customers in more than 20 United States ("U.S.") states and territories. Our goal is to be the leading provider of clean, affordable and reliable energy for consumers, and we operate with a simple mission: to power energy independence. We were founded to deliver customers a better energy service at a better price; and, through our solar and solar plus energy storage service offerings, we are disrupting the traditional energy landscape and the way the 21st century customer generates and consumes electricity.

We have a differentiated residential solar dealer model in which we partner with local dealers who originate, design and install our customers' solar energy systems and energy storage systems on our behalf. Our focus on our dealer model enables us to leverage our dealers' specialized knowledge, connections and experience in local markets to drive customer origination while providing our dealers with access to high quality products at competitive prices and technical oversight and expertise. We believe this structure provides operational flexibility, reduced exposure to labor shortages and lower fixed costs relative to our peers, furthering our competitive advantage.

We offer customers products to power their homes with affordable solar energy. We are able to offer savings and storage opportunities to most customers compared to utility-based retail rates with little to no up-front expense to the customer, and

we are able to provide energy resiliency and reliability to our solar plus energy storage customers. Our solar service agreements take the form of a lease, power purchase agreement ("PPA") or loan. The initial term of our solar service agreements is typically either 10 or 25 years. Service is an integral part our agreements and includes operations and maintenance, monitoring, repairs and replacements, equipment upgrades, on-site power optimization for the customer (for both supply and demand), the ability to efficiently switch power sources among the solar panel, grid and energy storage system, as appropriate, and diagnostics. During the life of the contract we have the opportunity to integrate related and evolving home servicing and monitoring technologies to upgrade the flexibility and reduce the cost of our customers' energy supply.

89.     Additionally, the 2019 10-K discussed the Company's customer agreements, disclosing, in relevant part:

We focus on growing a geographically diverse customer base with a strong credit profile. We perceive our recurring customer payments as high-quality assets given the broad and relatively inelastic demand for electricity and because our customers typically have high credit scores. As of December 31, 2019, our customers had, at the time of signing the solar service agreement, an average FICO® score of 739. The purpose of our stringent credit approval policy is to ensure reliability of collecting payment over the duration of the solar service agreements. As of December 31, 2019, approximately 0.8% of our customers were in default (over 120 days past due) under their solar service agreements.

Most of our solar service agreements have an initial term of 25 years with an opportunity for customers to renew for up to an additional 10 years via two fiveyear renewal periods. The customer is obligated to make payments to us on a monthly basis and we operate and maintain the solar energy system and energy storage system, if applicable, in good condition throughout the duration of the agreement. Under our lease agreements and PPAs, the customer's monthly payment or price per kilowatt hour ("kWh") is set based on a calculation that takes into account expected solar energy generation. The customer has an option of choosing a flat rate without an escalator or a lower initial rate with an escalator. As of December 31, 2019, approximately 68% of our lease agreements and PPAs contained a price escalator, ranging from 0.9% to 3.0% annually.

***Our solar service agreements are designed to offer the customer energy cost savings and bill stability relative to centralized utility prices, often resulting in an immediate reduction in the customer's overall utility bill, with little or no upfront costs.*** [1]

---

[1] All emphases included herein are added unless otherwise noted.

*February 25, 2020 Earnings Conference Call*

90.     That same day, the Company hosted an earnings conference call with investors and

analysts to discuss the Company's financial and operational results for the fourth quarter of 2019.

During the call, Defendant Berger stated, in relevant part:

> We closed out the year with another quarter of strong operational and financial
> results. 2019 was the year Sunnova became the industry leader in growth rate.
> Throughout the year, we increased our customer base, expanded our dealer
> network, lowered our cost of capital and boosted our storage attachment rates. As
> a result, we were able to meet, and in most cases, exceed our 2019 guidance targets.
>
> In Q4 2019 alone, we added 6,000 new customers, which is a 20% increase from
> what was added just last quarter and an 84% increase over the fourth quarter in
> 2018. For all of 2019, we grew our customer base at a rate of 30%. We are excited
> about the year ahead as we continue to acquire customers at a pace that is only
> continuing to quicken. Due to this increasing growth rate later in the call, we will
> update the 2020 guidance ranges we discussed in our third quarter 2019 earnings
> call.

*May 14, 2020 Press Release*

91.     On May 14, 2020, the Company issued a press release announcing its financial

results for the first quarter of 2020 Fiscal Year (the "Q1 2020 Press Release"). The Q1 2020 Press

Release stated, in relevant part:

> "As a leading residential solar and storage provider in the United States, Sunnova
> has a deep commitment to providing best-in-class energy service to our customers,
> in good times and in bad. As the world learns how to navigate the many challenges
> brought on by the COVID-19 pandemic, we realize that the work we do has become
> more essential than ever before," said [Defendant] Berger[.] "Despite these
> challenges, as a designated essential service provider, we responded quickly and
> decisively in the early days of COVID-19 to ensure not only the health and safety
> of our customers, dealers, and employees, but to also ensure our customers
> continued to receive the highest level of service.["]

*May 15, 2020 Earnings Conference Call*

92.     On May 15, 2020, the Company hosted an earnings conference call with investors and analysts to discuss its financial results for the first quarter of 2020 Fiscal Year (the "Q1 2020 Earnings Call"). During the call, Defendant Berger stated, in relevant part:

> While I cannot promise what the future will hold, ***I do know that Sunnova will continue to be a leader to our customers, our dealers, our lenders, our shareholders, and the communities we serve***. And thanks to the ample amount of liquidity we have secured, and the strength and flexibility of our business model, we are better positioned than anyone in the industry to not only get through this current crisis, but to navigate any additional challenges these uncertain times may bring.

***October 28, 2020 Press Release***

93.     On October 28, 2020, the Company issued a press release announcing its financial results for the third quarter of 2020 Fiscal Year (the "Q3 2020 Press Release"). The Q3 2020 Press Release contained quotes from Defendant Berger stating, in relevant part:

> As weather driven instability of regional power grids becomes increasingly intolerable for consumers and the integration of new technologies behind the meter grows, energy service providers like Sunnova will become even more attractive to homeowners. Driven by these rapid changes in technology, and a growing consumer appetite for cleaner, more reliable, and less expensive energy, Sunnova is well positioned to become the leading wireless power provider that consumers choose to power their energy independence.

***February 24, 2021 Press Release***

94.     On February 24, 2021, the Company issued a press release announcing its financial results for the fourth quarter of 2020 Fiscal Year and full 2020 Fiscal Year results (the "Q4 2020 Press Release"). The Q4 2020 Press Release contained quotes from Defendant Berger stating "Sunnova is well positioned to navigate the current market environment and to lead a decarbonized and decentralized energy transition while providing our customers with a better energy service at a better price."

***February 25, 2021 Annual Report***

95.     On February 25, 2021, Sunnova filed its annual report for the 2020 Fiscal Year on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Berger, Lane, Andrew, Brownell, D'Argenio,  Morgan, Mohamed, Shaper, Longstreth, and Kimmelman and contained SOX certifications, signed by Defendants Berger and Lane, attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2020 10-K contained substantively similar descriptions of the Company's business and customer agreements as discussed, supra, in ¶¶ 87-89.

*April 12, 2021 Environmental, Social, and Governance Report*

96.     On April 12, 2021, the Company published its 2020 Environmental, Social, and Governance Report (the "2020 ESG Report"). Regarding the Company's business approach, the 2020 ESG Report stated, in relevant part:

> At Sunnova, we believe that sustainability is the foundation of a strong business and a better tomorrow. We seek to inspire positive social change and foster a culture of integrity, performance, and ethical business practices. Beyond the impact of our core business, we focus our attention on areas where we believe we can make the biggest positive environmental impact. We are working to reduce the impact of our operations in order to reduce our carbon footprint and improve efficiency.

97.     Additionally, regarding corporate governance, the 2020 ESG Report stated, in relevant part:

> At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices.
>
> Because ESG is a top priority, we formalized its oversight at the Board level through our Nominating and Governance Committee in October 2020. The Committee is responsible for overseeing our ESG approach, strategy, and performance, and has adopted these responsibilities as outlined in our Committee Charter. We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs.

***

Our <u>Code of Conduct</u> describes the entrepreneurial spirit on which Sunnova was built and the high standards by which we conduct business. These standards reflect our core values and drive us to achieve our mission. We expect all of our business partners, including our Dealers and Vendors, to follow the laws and regulations where they operate and to share our commitment to ethics, sustainability, environmental stewardship, health and safety, human rights, and labor issues. We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs.

### April 28, 2021 Press Release

98.     On April 28, 2021, the Company issued a press release announcing its financial results for the first quarter of 2021 Fiscal Year (the "Q1 2021 Press Release"). The Q1 2021 Press Release stated, in relevant part:

> "Sunnova's strong first quarter results and continued rapid growth reiterates the power of our business model and capitalization strategy," said [Defendant] Case 4:24-cv-00569 Document 1 Filed on 02/16/24 in TXSD Page 10 of 32 11 Berger[.] "***Our rapid growth has been made possible through the value of the Sunnova Network, whereby software and services enable aggregation capabilities to create additional value for our customers, dealers and equipment partners***.["]

### April 29, 2021 Earnings Conference Call

99.     On April 29, 2021, the Company hosted an earnings conference call with investors and analysts to discuss its financial results for the first quarter of 2021 Fiscal Year (the "Q1 2021 Earnings Call"). During the call, Defendant Berger stated, in relevant part:

> We are also committed to upholding strong corporate governance practices and conducting business the right way as our core values of service, synergy, and sustainability underpin our corporate culture. We look forward to continuing our work on ESG and will continue to communicate our progress over time.

### July 28, 2021 Press Release

100.    On July 28, 2021, the Company issued a press release announcing its financial results for the second quarter of 2021 Fiscal Year (the "Q2 2021 Press Release"). The Q2 2021 Press Release stated, in relevant part:

> "The residential solar industry has entered a new phase of maturation and growth and with it a new value proposition for customers has emerged. Where it was once solely focused on the product and savings, the customer value proposition is now acutely focused on reliability and resiliency as well as savings," said [Defendant] Berger[.] "Customers are now expecting a long-term energy service offering that is fast and intelligent. ***To meet this need, we have dedicated resources to building out our end-to-end software platform, which contains capabilities such as quoting tools for dealers, predictive service analytics for customers, and grid services software for aggregation.***
>
> "Our field service technicians and customer care team are increasingly providing higher quality services at a quicker pace to our growing customer base. Service delivery must be quick, accurate, and predictive as new technologies such as batteries, load managers, electric vehicle chargers, and secondary generation enter the market. ***Service is becoming the crucial differentiator in the residential energy industry, and Sunnova continues to position itself as the industry leader for wireless power services."***

***July 29, 2021 Earnings Conference Call***

101.    On July 29, 2021, the Company hosted an earnings conference call with investors and analysts to discuss its financial results for the second quarter of 2021 Fiscal Year (the "Q2 2021 Earnings Call"). During the call, Defendant Berger stated, in relevant part:

> Our dedicated field service technicians and customer care team are increasingly providing higher quality service at a quicker pace to our growing customer base. The Sunnova-employed service team is focused on delivering unparalleled energy service quickly, accurately, and predicatively as new technologies such as batteries, load managers, electric vehicle chargers, and secondary generation enter the market. Service is becoming the crucial differentiator in the residential energy industry and Sunnova continues to position itself as the industry leader for service.

***October 27, 2021 Press Release***

102.    On October 27, 2021, the Company issued a press release announcing its financial results for the third quarter of 2021 Fiscal Year (the "Q3 2021 Press Release"). The Q3 2021 Press Release stated, in relevant part:

> "At Sunnova, we are committed to providing an unparalleled energy experience to our customers. We see brand and service as the critical differentiators in our industry and we are continuing to develop our technological, operational, and logistical capabilities to improve the quality and response time of the energy service we provide. As more equipment manufacturers enter our rapidly growing industry and broaden their equipment offerings, it has become clear that consumers require a service provider who integrates all of the capabilities and technological advancements into a simple, seamless, and integrated energy system that is backed up with quick and efficient service - and that is who Sunnova is. Our vision is to be a wireless power provider and it is our goal to electrify the home for our customers so that they have the freedom to live life uninterrupted."

### October 28, 2021 Earnings Conference Call

103.    On October 28, 2021, the Company hosted an earnings conference call with investors and analysts to discuss its financial results for the third quarter of 2021 Fiscal Year (the "Q3 2021 Earnings Call"). During the call, Defendant Berger discussed the Company's "unique and unparalleled service commitment to customers":

> Launching first in select key markets, we have established a goal well beyond that of any other residential energy service provider. To provide service within 72 hours for our solar-only customers and within 24 hours for our solar plus storage customers. This responsiveness, when combined with the resilience of our storage product offering, amounts to a superior energy experience for customers who are frustrated with the increasing cost and decreasing reliability they experience with a monopoly power provider.

> We will accomplish this goal by accelerating the build-out of our software platform, continuing to build up our highly experienced and professionally managed service team, and continuously improve our logistics capabilities. This unprecedented service commitment will allow us to provide our customers with the power to live life uninterrupted. In time, it is our goal for the Sunnova name to be synonymous with the best energy service in the world.

### February 23, 2022 Press Release

104.    On February 23, 2022, the Company issued a press release announcing its financial results for the fourth quarter of 2021 Fiscal Year and full 2021 Fiscal Year (the "Q4 2021 Press Release"). The Q4 2021 Press Release stated, in relevant part:

> "In 2021, we saw the resiliency of our people, our dealers, our business model, and capitalization strategy help Sunnova navigate economic and regulatory uncertainties. As centralized utilities continue to rapidly increase their rates, Sunnova is able to provide its customers even greater savings through an energy service that is more reliable, more resilient, and more environmentally sustainable."

### February 24, 2022 Annual Report

105.    On February 24, 2022, the Company filed its annual report with the SEC for the 2021 Fiscal Year (the 2021 10-K). The 2021 10-K was signed by Defendants Berger, Lane, Andrew, Brownell, D'Argenio, Longstreth, Mohamed, Morgan, Shaper, and Yang and contained SOX certifications, signed by Defendants Berger and Lane, attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 10-K contained substantively similar descriptions of the Company's business and customer agreements as discussed, supra, in ¶¶87-89.

### April 7, 2022 Proxy Statement

106.    On April 7, 2022, the Company filed its Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Andrew, Mohamed, Yang, Berger, Brownell, D'Argenio, Longstreth, Morgan, Shaper, and Kimmelman solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

107.    The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Andrew, Mohamed, and Yang of our Board of Directors to serve three-year terms (2) approve, on a non-binding advisory basis, the compensation of our named executive officers; (3)

approve the Sunnova Energy International Inc. Employee Stock Purchase Plan; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for 2022 Fiscal Year.

108.    Regarding "Risk Management," the 2022 Proxy Statement stated the following, in relevant part:

> Our Board has oversight responsibility of the processes established to report and monitor material risks applicable to us. Our Audit Committee assists our Board in oversight of the integrity of the Company's financial statements, our compliance with legal and regulatory requirements, the review of our internal auditors and independent registered public accounting firm, and cybersecurity oversight. Certain risks associated with the performance of our executive management fall within the authority of our Nominating, Corporate Governance and Sustainability Committee, which is responsible for evaluating potential conflicts of interest and independence of directors and Board of Directors candidates, monitoring and developing corporate governance principles and overseeing the process by which our Board, our Chief Executive Officer and our executive management are evaluated. Risks associated with retaining executive management, including succession planning, fall within the scope of the authority of our Compensation and Human Capital Committee, which assists our Board in reviewing and administering compensation, benefits, incentive and equity−based compensation plans. To assist in satisfying these responsibilities, the Compensation and Human Capital Committee has retained its own independent compensation consultant and meets regularly with management to understand the financial, human resources and stockholder implications of compensation decisions being made. Responsibility for risk oversight that does not fall within the scope of authority of the three standing committees of our Board rests with our entire Board. Our Board also has the responsibility for monitoring and assessing any potential material risks identified by its committees, or otherwise ensuring management is monitoring and assessing, and, to the extent appropriate, mitigating such risks. Risks falling within this area include, but are not limited to, general business and industry risks, operating risks, financial risks and compliance risks.
>
> Our Board has delegated to management the responsibility to manage risk and bring to the attention of our Board the most material risks to our Company. We do not assign the responsibility for all risk management to a single risk management officer within our executive management. Rather, we rely on executive management to administer an enterprise risk management program (the "ERM program") that is designed to ensure that all significant risks to the Company, on a consolidated basis, are being managed and monitored appropriately. Our Internal Audit Department oversees an annual enterprise risk assessment (the "ERA"). The ERA is designed to identify the portfolio of the Company's business risks, to

individually evaluate their likelihood of occurrence, and to identify existing and potential future mitigation strategies. The ERM program assesses the potential magnitude of the most significant risks identified in the ERA, identifies other operational, commercial, macroeconomic and geopolitical risks facing the Company, monitors key indicators to assess the effectiveness of the Company's risk management activities, and manages risks to be within the Company's desired risk profile. Meetings are held at least quarterly to discuss risk mitigation efforts to manage identified risks. The management team present in the risk management meetings includes our Executive Vice President and Chief Financial Officer, Executive Vice President, General Counsel and Secretary, and the other members of our management team charged with evaluating the Company's disclosure controls. Meetings are facilitated by our Internal Audit Department head. Our Board monitors the ERM program and other risk management information provided to it to assess the Company's risk management practices and systems in light of the risk philosophy and risk tolerance of our Board. The ERM program results are reported to our Board each quarter to assist in its oversight of risk management.

109.    With respect to the Sunnova Code of Conduct, the 2022 Proxy Statement stated that "included with our Corporate Governance Guidelines detailed on our website, www.sunnova.com, and available in print to any stockholder who requests a copy, are our Code of Conduct and our Code of Ethics for the Chief Executive Officer and Senior Financial Officers. We intend to satisfy the disclosure requirement regarding any changes in these codes of ethics we have adopted and/or any waiver therefrom by posting such information on our website or by filing a Form 8-K for such events."

110.    The 2022 Proxy Statement was materially false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Sunnova Code of Conduct and Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

111.    The 2022 Proxy Statement was also materially false and misleading because it failed to disclose, *inter alia*, that: (1) Project Hestia's intended beneficiaries—disadvantaged homeowners and communities—were victims of the Company's predatory business practices; (2) Sunnova did not have sufficient or effective risk management or compliance controls and procedures in place; (3) as a result, Sunnova faced an elevated risk of regulatory, civil, and other oversight investigations; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

112.    As a result of Defendants Andrew, Mohamed, Yang, Berger, Brownell, D'Argenio, Longstreth, Morgan, Shaper, and Kimmelman causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Andrew, Mohamed, and Yang to the Board, thus allowing them to continue breaching their fiduciary duties to the Company and approve, on non-binding advisory basis, the compensation of the Company's named executive officers.

### *April 12, 2022 Environmental, Social, and Governance Report*

113.    On April 12, 2022, the Company published its 2021 Environmental, Social and Governance Report (the "2021 ESG Report"). Regarding corporate governance, the 2021 ESG Report stated, in relevant part:

> At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance and embracing ethical business practices.
>
> This year, with oversight from the Nominating, Corporate Governance and Sustainability Committee, we made great strides in refining our ESG approach, strategy and performance as outlined in our Committee Charter. We conduct our business in a responsible manner with oversight by our Board of Directors and

executive management in compliance with our ethics and compliance policies and programs.

***

We seek to empower Sunnova employees to be champions of ESG within their roles and responsibilities. Our vision is to embed ESG throughout the organization through continuous education and engagement.

***April 28, 2022 Earnings Conference Call***

114.     On April 28, 2022, the Company hosted an earnings conference call with investors and analysts to discuss its financial results for the first quarter of 2022 Fiscal Year (the "Q1 2022 Earnings Call"). During the call, Defendant Berger stated, in relevant part:

> Earlier in the month, we published our second annual ESG report, detailing the steps we have taken over the last twelve months to enhance our ESG strategy and reporting. Our new report, titled "Charging Ahead", describes the impact of the growth we have seen this year and how we are integrating ESG best practices into our core business to drive positive outcomes for our business and society.
>
> Building off our first report last year, our next step was to establish a more formal forward-looking strategy. To start this process, we conducted a materiality assessment to identify the ESG topics that were most important to our business and to our stakeholders. We engaged our employees, investors, community partners, vendors, and other groups to assess ESG-related topics. From this assessment, we identified nine priority ESG topics for our business, as well as others that we consider material. The results of this assessment can be found in our new report.

***July 27, 2022 Press Release***

115.     On July 27, 2022, the Company issued a press release announcing its financial results for the second quarter of 2022 Fiscal Year (the "Q2 2022 Press Release"). The Q2 2022 Press Release stated, in relevant part:

> "High inflation and overall economic distress is further reinforcing the value of the cost savings and predictable nature of the essential energy services Sunnova provides," said [Defendant] Berger[.] "As centralized utilities continue to increase their rates, demand remains strong for our energy services while homeowners seek to offset rising energy costs and increase their energy reliability. ***In light of inflationary pressures, consumers are facing tough budgeting choices, but***

*Sunnova will continue to provide a better energy service at a better price to ensure our customers can afford the energy they need to power their lives.*

### October 26, 2022 Press Release

116.    On October 26, 2022, the Company issued a press release announcing its financial results for the third quarter of 2022 Fiscal Year (the "Q3 2022 Press Release"). The Q3 2022 Press Release stated, in relevant part:

> In the third quarter, we took action to fortify our liquidity and satisfy our planned 2023 corporate capital needs ahead of schedule through a timely capital raise, putting the company in an excellent financial position with a strong balance sheet," said [Defendant] Berger[.] ***"Our record low customer default and delinquency rates and customer feedback clearly show that consumers do not see us as merely providing financing but providing an essential service to them***. Sunnova is optimally positioned to benefit from this strong consumer demand for its energy service, catalyzed by a combination of our focus on service, the Inflation Reduction Act, and the global energy crisis, as homeowners look to avoid rising utility bills that they must pay.["]

### February 23, 2023 Annual Report

117.    On February 23, 2023, the Company filed its annual report with the SEC for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Berger, Lane, Andrew, Brownell, D'Argenio, Longstreth, Mohamed, Morgan, Shaper, and Yang and contained SOX certifications, signed by Defendants Berger and Lane, attesting to the accuracy of the financial statements contained in the 2022 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2022 10-K contained substantively similar descriptions of the Company's business and customer agreements as discussed, supra, in ¶¶ 87-89.

### April 6, 2023 Proxy Statement

118.    On April 6, 2023, the Company filed its Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Berger, D'Argenio, Morgan, Brownell, Longstreth, Shaper,

Andrew, Mohamed, and Yang solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

119. The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Berger, D'Argenio, and Morgan of our Board of Directors to serve three-year terms; (2) approve, in a non-binding advisory vote, the compensation of our named executive officers; and (3) ratify the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm for 2023 Fiscal Year.

120. Regarding the "Risk Management," the 2023 Proxy Statement stated the following, in relevant part:

> Our Board has oversight responsibility of the processes established to report and monitor material risks applicable to us. Our Audit Committee assists our Board in oversight of the integrity of the Company's financial statements, our compliance with legal and regulatory requirements, the review of our internal auditors and independent registered public accounting firm, and cybersecurity oversight. Certain risks associated with the performance of our executive management fall within the authority of our Nominating, Corporate Governance and Sustainability Committee, which is responsible for evaluating potential conflicts of interest and independence of directors and Board of Directors candidates, monitoring and developing corporate governance principles and overseeing the process by which our Board, our Chief Executive Officer and our executive management are evaluated. Risks associated with retaining executive management, including succession planning, fall within the scope of the authority of our Compensation and Human Capital Committee, which assists our Board in reviewing and administering compensation, benefits, incentive and equity−based compensation plans. To assist in satisfying these responsibilities, the Compensation and Human Capital Committee has retained its own independent compensation consultant and meets regularly with management to understand the financial, human resources and stockholder implications of compensation decisions being made. Responsibility for risk oversight that does not fall within the scope of authority of the three standing committees of our Board rests with our entire Board. Our Board also has the responsibility for monitoring and assessing any potential material risks identified by its committees, or otherwise ensuring management is monitoring and assessing, and, to the extent appropriate, mitigating such risks. Risks falling within this area include, but are not limited to, general business and industry risks, operating risks, financial risks and compliance risks.

Our Board has delegated to management the responsibility to manage risk and bring to the attention of our Board the most material risks to our Company. We do not assign the responsibility for all risk management to a single risk management officer within our executive management. Rather, we rely on executive management to administer an enterprise risk management program (the "ERM program") that is designed to ensure that all significant risks to the Company, on a consolidated basis, are being managed and monitored appropriately. Our Internal Audit Department oversees an annual enterprise risk assessment (the "ERA"). The ERA is designed to identify the portfolio of the Company's business risks, to individually evaluate their likelihood of occurrence, and to identify existing and potential future mitigation strategies. The ERM program assesses the potential magnitude of the most significant risks identified in the ERA, identifies other operational, commercial, macroeconomic and geopolitical risks facing the Company, monitors key indicators to assess the effectiveness of the Company's risk management activities, and manages risks to be within the Company's desired risk profile. Meetings are held at least quarterly to discuss risk mitigation efforts to manage identified risks. The management team present in the risk management meetings includes our Executive Leadership Team, and the other members of our management team charged with evaluating the Company's disclosure controls. Meetings are facilitated by our Internal Audit Department head. Our Board monitors the ERM program and other risk management information provided to it to assess the Company's risk management practices and systems in light of the risk philosophy and risk tolerance of our Board. The ERM program results are reported to our Board each quarter to assist in its oversight of risk management.

121.    With Respect to the Sunnova Code of Conduct, the 2023 Proxy Statement stated that "Included with our Corporate Governance Guidelines detailed on our website, *www.sunnova.com*, and available in print to any stockholder who requests a copy, are our Code of Conduct and our Code of Ethics for the Chief Executive Officer and Senior Financial Officers. We intend to satisfy the disclosure requirement regarding any changes in these codes of ethics we have adopted and/or any waiver therefrom by posting such information on our website or by filing a Form 8-K for such events."

122.    The 2023 Proxy Statement was materially false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Sunnova Code of Conduct and Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy

Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

123.    The 2023 Proxy Statement was also materially false and misleading because it failed to disclose, *inter alia*, that: (1) Project Hestia's intended beneficiaries—disadvantaged homeowners and communities—were victims of the Company's predatory business practices; (2) Sunnova did not have sufficient or effective risk management or compliance controls and procedures in place; (3) as a result, Sunnova faced an elevated risk of regulatory, civil, and other oversight investigations; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

124.    As a result of Defendants Berger, D'Argenio, Morgan, Brownell, Longstreth, Shaper, Andrew, Mohamed, and Yang causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Berger, D'Argenio, and Morgan to the Board, thus allowing them to continue breaching their fiduciary duties to the Company and to approve, in a non-binding advisory vote, the compensation of the Company's named executive officers.

### *April 20, 2023 Press Release*

125.    On April 20, 2023, the Company issued a press release announcing the new solar loan channel, supported by the DOE's conditional commitment to the LPO Loan. The April 20, 2023 press release stated, in relevant part:

> Sunnova [. . .] today announced a conditional commitment by the [LPO] to provide an up to $3.0 billion partial loan guarantee, which equates to a 90% guarantee of

up to $3.3 billion of financing to support loans originated by Sunnova under a new solar loan channel named "Project Hestia."

Project Hestia would provide disadvantaged individuals and communities with increased access to Sunnova services by indirectly and partially guaranteeing the cash flows associated with those consumers' loans. To be eligible, each energy system must be outfitted with Sunnova's purpose-built technology, accessible by smart phone or other personal electronic device. The technology is designed to improve customer insights regarding their power usage and will facilitate demand response behavior. Sunnova believes this approach is expected to expand access to Sunnova's EaaS offerings, lay the foundation for future virtual power plant (VPP) activities, decrease greenhouse gas emissions, and increase the demand response impact of residential power systems.

### *April 26, 2023 Press Release*

126.    On April 26, 2023, the Company issued a press release announcing its financial results for the first quarter of 2023 Fiscal Year (the "Q1 2023 Press Release"). The Q1 2023 Press Release stated, in relevant part:

> "Our strong growth trajectory can be attributed to our continuous investments in software, service, and multiple channels for growth, which have allowed Sunnova to increase market share and widen its total addressable market. Just last week, we announced a conditional commitment with the [LPO] to expand access to Sunnova's Energy as a Service offerings, potentially adding to our growth by making our energy services accessible to homeowners who may not have qualified without this commitment. We are dedicated to delivering the highest quality service to our customers and to our communities."

### *April 27, 2023 Earnings Conference Call*

127.    On April 27, 2023, the Company hosted an earnings conference call with investors and analysts to discuss its financial results for the first quarter of 2023 Fiscal Year (the "Q1 2023 Earnings Call"). During the call, Defendant Berger stated, in relevant part:

> The robust demand for our energy services, as described on our previous earnings calls, has persisted throughout the balance of the first quarter and into the month of April. This strong demand can be attributed to our ability to offer customers more affordable energy, higher reliability, and exceptional customer service relative to the centralized power monopolies.

Our commitment to providing a superior energy service sets us apart as industry leaders. We provide responsive and reliable service to our valued customers, utilizing cutting-edge technologies to efficiently manage energy supply and demand through our Sunnova software platform, which powers our seamless Sunnova Adaptive Home, Sunnova Adaptive Business, and Sunnova Adaptive Community service experiences.

### *May 1, 2023 Sustainability Report*

128.    On May 1, 2023, the Company published its 2022 Sustainability Report. Regarding

Sunnova's plan with sustainability, the 2022 Sustainability Report stated, in relevant part:

In keeping with our values of Service, Synergy, and Sustainability, we are committed to continually improving our management of sustainability matters and their impact on our business. Our sustainability strategy serves to complement our corporate objectives, mitigate risks to the business and maximize our impact for our customers, employees, investors, communities, and other stakeholders. We frequently evaluate sustainability risks and opportunities through processes that include materiality assessments, annual risk management evaluations, and regular engagement with stakeholders to ensure we meet their needs.

129.    Additionally, the 2022 Sustainability Report stated the following about Sunnova's

customer service:

As a leading Energy as a Service (EaaS) provider, we are providing a less expensive, more reliable, and cleaner energy service experience to our customers, ultimately, transforming the way people power their homes and businesses. With our energy services, our customers are achieving greater energy independence, resilience, and cost savings while reducing their environmental footprint.

It is our unwavering commitment to providing exceptional customer service that helps sets us apart in our industry.

130.    Lastly, the 2022 Sustainability Report stated the following about corporate

governance:

At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices.

As a responsible and sustainable business, we believe that good governance is essential to achieving our long-term goals and creating value for our stakeholders. We are committed to maintaining a high standard of corporate governance, which includes oversight of sustainability issues. Our approach to governance involves a

commitment to transparency, accountability, and continuous improvement. We understand that good governance is not just a matter of compliance, but it is also a way of building trust and maintaining strong relationships with our stakeholders.

### *July 26, 2023 Press Release*

131.    On July 26, 2023, the Company issued a press release announcing its financial results for the second quarter of 2023 Fiscal Year (the "Q2 2023 Press Release"). The Q2 2023 Press Release stated, in relevant part:

> "Our leading Energy as a Service business model, which is supported by three fundamental pillars - scale, service, and the retention of long-term contracted cash flows - has firmly established us as an industry leader quarter over quarter," said Defendant Berger[.] "We are rapidly achieving scale as evidenced by another record number of customers placed into service in the second quarter. This impressive customer growth is a testament to our commitment to providing exceptional service and meeting the needs of our expanding customer base. As a result, we are once again increasing our customer additions guidance by 10,000 customers at the midpoint. We are already in the customer contracting phase for 2024, and, given our strong growth momentum, we are projecting 40% customer growth over 2023.
>
> "We are committed to providing exceptional and timely service. We expect our 24-hour service guarantee, currently in four markets and growing to seven by year-end, to reach 70% of our customer base. This unparalleled focus on service further solidifies our position as the industry leader in Energy as a Service, and allows our customers to gain access to reliable, affordable, and sustainable energy solutions.["]

### *September 28, 2023 Press Release*

132.    On September 28, 2023, the Company issued a press release announcing that Sunnova launched the LPO Loan. The September 28, 2023 press release stated, in relevant part:

> Today marks the beginning of an exciting chapter in our pursuit of a cleaner and more equitable energy landscape. With our collaboration with the [DOE], we are embarking on a journey that expands clean energy access and delivers economic benefit to Americans in disadvantaged communities," said [Defendant] Berger[.] "This partnership reflects our commitment to innovation with purpose."

### *October 19, 2023 Press Release*

133.    On October 19, 2023, the Company issued a press release titled "Sunnova Prices First Project Hestia Securitization of Residential Solar Battery Systems." The press release stated, in relevant part:

> Sunnova [. . .] today announced the pricing of its Hestia I securitization, which indirectly benefits from [the LPO Loan].
>
> "Project Hestia stands as a testament to Sunnova and the DOE's unwavering commitment to spearheading transformative initiatives that benefit customers, empower communities, and enhance the overall energy landscape in the United States," said [Defendant] Berger[.] "This successful pricing of Project Hestia's first securitization showcases our continuing dedication to pioneering sustainable, reliable, and cost-effective energy solutions."

134.    The statements referenced in ¶¶ 87-105, 113-117, and 125-133 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (1) Project Hestia's intended beneficiaries— disadvantaged homeowners and communities—were victims of the Company's predatory business practices; (2) Sunnova did not have sufficient or effective risk management or compliance controls and procedures in place; (3) as a result, Sunnova faced an elevated risk of regulatory, civil, and other oversight investigations; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth Emerges**

135.    On November 22, 2023, the truth began to emerge when the *Washington Free Beacon* published an article titled "Biden Admin Gave $3 Billion Loan to Solar Company Accused of Scamming Elderly." The article revealed in relevant part:

> A solar company that was awarded a $3 billion Department of Energy loan has been accused of scamming dementia patients on their deathbeds into signing five-figure, multi-decade solar panel leases, according to interviews and state consumer complaint records obtained by the Washington Free Beacon.
>
> Terry Blythe, a Texas resident, told the Washington Free Beacon that her father was 86 years old and had been diagnosed with dementia when a door-to-door Sunnova salesman persuaded him to sign a 25-year solar panel lease in 2020. When her father passed away earlier this year, Blythe said she was left to grapple with the $34,000 contract.
>
> ***
>
> Blythe's is one of over 50 consumer complaints that have been filed against Sunnova with the Texas attorney general's office since last year, for issues ranging from maintenance delays to allegedly predatory sales tactics.
>
> ***
>
> Sen. John Barrasso (R., Wyo.), the top Republican on the Senate Energy and Natural Resources Committee, and other lawmakers have been investigating potential conflicts of interest at the DOE's Loan Programs Office (LPO), including its funding to Sunnova.
>
> Before LPO director Jigar Shah joined the Biden administration, he founded and led a trade association called Cleantech Leaders Roundtable, which shares a board member with Sunnova. Cleantech Leaders Roundtable has become a gatekeeper for companies seeking loans from Shah's office, cohosting paid events for its members with the LPO director, the Free Beacon reported in October.
>
> "The potential for conflicts of interest, especially in light of a $3 billion loan approval for Sunnova, a company who shares a board member with Cleantech Leaders Roundtable, cannot be overlooked," said Barrasso in a letter to DOE's ethics counsel Susan Beard this month.

136.    On December 8, 2023, the truth fully emerged when Representative Cathy McMorris Rodgers, Chair of the U.S. House Committee on Energy and Commerce, and Senator John Barrasso, ranking member of the U.S. Senate Committee on Energy and Natural Resources,

sent a letter to the DOE and Sunnova requesting information related to the LPO Loan following

the release of the reports regarding the Company's business practices. The letter stated, in relevant

part:

> We write to you regarding disturbing reports about Sunnova Energy Corporation (Sunnova), a residential solar company, to which the Department of Energy's (DOE) Loan Programs Office (LPO) recently awarded a $3 billion partial loan guarantee.
>
> Billed as "the single largest commitment ever made by the Federal Government to solar power," LPO closed this partial loan guarantee to Sunnova's "Project Hestia" on September 28, 2023.[] According to LPO, this project will make distributed energy resources and virtual power plant software available to more Americans by providing loans to approximately 75,000 to 115,000 homeowners for clean energy systems.[] This project will focus on households in disadvantaged communities, aiming to provide at least 20 percent of loans to customers with FICO credit scores of 680 or less and up to 20 percent of loans to homeowners in Puerto Rico.
>
> We are alarmed about recent, credible reports that Sunnova has racked up numerous consumer complaints, including those alleging troubling sales practices, such as Sunnova pressing elderly homeowners in poor health to sign long-term contracts costing tens of thousands of dollars.[] These reports cite interviews with individuals who struggled to deal with large contracts that their elderly parents signed shortly before passing away as well as state consumer complaints alleging maintenance delays and predatory sales strategies.[] For example, one woman interviewed stated that a door-to-door Sunnova salesman sold her father—who she characterized as in hospice care—a $60,000 solar system for his mobile home shortly before his death.
>
> Additional reports suggest these troubling reports are not isolated incidents. For example, while Project Hestia will target Puerto Rican homeowners for 20 percent of its loans, its residents have previously experienced major problems with Sunnova's services there. By 2017, Puerto Rico's Independent Office of Consumer Protection reportedly received over 1,000 complaints regarding Sunnova systems that include claims of misleading consumers and failing to deliver lower energy bills as promised.[] In 2019, the Puerto Rican Energy Bureau also released a report confirming the validity of numerous consumer complaints it received. These included complaints of consumers accidentally signing up for 25-year contracts, consumers being misled about potential savings with solar panels, and Sunnova not fully revealing the costs of financing these solar panels to consumers.[] Residents in other parts of the country have also reported problems with Sunnova systems, including deceptive sales practices.[] These allegations are particularly troubling, as LPO has stated this program will focus on disadvantaged communities.

137.     On this news, the Company's share price dropped $2.00 per share, or 16.12%, from its December 7, 2023 closing price of $12.41 per share to close on December 8, 2023 at $10.41 per share.

## DAMAGES TO SUNNOVA

138.     As a direct and proximate result of the Individual Defendants' misconduct, Sunnova has lost and expended, and will continue to lose and expend, many millions of dollars.

139.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

140.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

141.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

142.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company as well as the personal profits of certain of the Individual Defendants who engaged in lucrative insider trading while breaching their fiduciary duties to the Company.

143.     As a direct and proximate result of the Individual Defendants' conduct, Sunnova has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

144.     Plaintiff brings this action derivatively and for the benefit of Sunnova to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sunnova, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

145.     Sunnova is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.     Plaintiff is, and has been at all relevant times, a shareholder of Sunnova. Plaintiff will adequately and fairly represent the interests of Sunnova in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

147.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

148.     A pre-suit demand on the Board of Sunnova is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Berger, Brownell, Shaper, Longstreth, D'Argenio, Morgan, Andrew, Mohamed, and Yang (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of nine Directors

who are on the Board at the time this action is commenced.

149.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

150.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Sunnova to issue materially false and misleading statements. Specifically, the Director-Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

151.   Additional reasons that demand on Defendant Brownell is futile follow. Defendant Brownell has served as a Company director since October 2020. Defendant Brownell also serves as the Chair of the Compensation and Human Capital Committee and as a member of the Nominating, Corporate Governance and Sustainability Committee. She receives handsome compensation for her role at the Company, including $135,000 in 2020, $189,321 in 2021, $202,704 in 2022, and $215,079 in 2023. Moreover, Defendant Brownell signed, and thus personally made, the false and misleading statements contained in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K. In addition, she solicited the 2022 Proxy Statement and 2023 Proxy

Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Brownell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Shaper is futile follow. Defendant Shaper has served as a Company director since June 2019. Defendant Shaper also serves as the Chair of the Audit Committee. He receives handsome compensation for his role at the Company, including $205,000 in 2021, $205,000 in 2022, and $199,456 in 2023. Moreover, Defendant Shaper signed, and thus personally made, the false and misleading statements contained in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K. In addition, he solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Shaper engaged in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Shaper breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Longstreth is futile follow. Defendant Longstreth has served as a Company director since June 2019. Defendant Longstreth also serves as a member of the Audit Committee and as a member of the Nominating, Corporate Governance and Sustainability Committee. Moreover, Defendant Longstreth signed, and thus personally made, the false and misleading statements contained in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K. In addition, he solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Longstreth breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154. Additional reasons that demand on Defendant Berger is futile follow. Defendant Berger has served as a Company director since April 2019. Defendant Berger also serves as the Company's CFO, President, and Chairman of the Board. He receives handsome compensation for his role at the Company, including $1,593,926 in 2020, $1,465,350 in 2021, $5,358,001 in 2022, and $5,865,040 in 2023. In addition, Defendant Berger personally made false and misleading

statements in multiple press releases during the Relevant Period and signed, and thus personally made, the false and misleading statements contained in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K. Moreover, he solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and  contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Berger engaged in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Berger is a defendant in the Securities Class Action. For these reasons, Defendant Berger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant D'Argenio is futile follow. Defendant D'Argenio has served as a Company director since June 2019. Defendant D'Argenio also serves as a member of the Compensation and Human Capital Committee. Moreover, Defendant D'Argenio signed, and thus personally made, the false and misleading statements contained in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K.  In addition, he solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary

duties to the Company.  As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant D'Argenio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Morgan is futile follow. Defendant Morgan has served as a Company director since June 2019. Defendant Morgan also serves as a member of the Compensation and Human Capital Committee. He receives handsome compensation for his role at the Company, including $197,500 in 2021, $201,056 in 2022, and $186,411 in 2023. Moreover, Defendant Morgan signed, and thus personally made, the false and misleading statements contained in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K.   In addition, he solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Morgan engaged in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Morgan breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.     Additional reasons that demand on Defendant Andrew is futile follow. Defendant Andrew has served as a Company director since October 2019. Defendant Andrew also serves as the Chair of the Nominating, Corporate Governance, and Sustainability Committee. She receives handsome compensation for her role at the Company, including $176,342 in 2020, $196,259 in 2021, $195,876 in 2022, and $206,948 in 2023 . Moreover, Defendant Andrew signed, and thus personally made, the false and misleading statements contained in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K. In addition, she solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Andrew breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158.     Additional reasons that demand on Defendant Mohamed is futile follow. Defendant Mohamed has served as a Company director since December 2020. Defendant Mohamed also serves as a member of the Nominating, Corporate Governance, and Sustainability Committee and as a member of the Audit Committee. He receives handsome compensation for his role at the Company, including $120,000 in 2020, $190,000 in 2021, $193,555 in 2022, and $197,113 in

2023. Moreover, Defendant Mohamed signed, and thus personally made, the false and misleading statements contained in the 2020 10-K, 2021 10-K, and 2022 10-K. In addition, he solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Mohamed breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.   Additional reasons that demand on Defendant Yang is futile follow. Defendant Yang has served as a Company director since October 2021. Defendant Yang also serves as a member of the Audit Committee. She receives handsome compensation for her role at the Company, including $120,000 in 2021, $196,679 in 2022, and $192,342 in 2023. Moreover, Defendant Yang signed, and thus personally made, the false and misleading statements contained in the 2021 10-K, and 2022 10-K.  In addition, she solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained false and misleading statements and contributed to the reelection of Defendants Andrew, Mohamed, Yang, Berger, D'Argenio, and Morgan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.  As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to

protect corporate assets. For these reasons, Defendant Yang breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.    Additional reasons that demand on the Board is futile follow.

161.    Defendants Shaper (Chair), Longstreth, Mohamed, and Yang (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, monitoring the Company's system of internal controls, reviewing their adequacy on an ongoing basis, and recommending to the Board remedies to any identified deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's internal controls, failed to identify or remedy deficiencies with the Company's internal controls, and thus failed prevent the Company from issuing false and misleading statements to the public and the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

162.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to act with honesty and integrity; failed to provide the SEC and public with complete, fair, accurate, timely, and understandable disclosures; failed to comply with applicable laws and regulations; failed to act in good faith, responsibly with due care and diligence and without misrepresentation

or omission of material facts; failed to promote ethical behavior at the Company; and failed to promptly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

163.    Sunnova has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Sunnova any part of the damages Sunnova suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

164.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

165.    The acts complained of herein constitute violations of fiduciary duties owed by Sunnova's officers and directors, and these acts are incapable of ratification.

166.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sunnova. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue the Director-Defendants or certain of the officers of Sunnova, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

167.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Sunnova to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

168.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

171.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

172.    Under the direction and watch of the Individual Defendants, the 2022 and 2023 Proxy Statement failed to disclose, *inter alia*: (1) though the Company claimed its officers and directors adhered to the Snowflake Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed;(2) contrary to the 2022 and 2023 Proxy Statements' descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (3) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to Sunnova.

173.    The 2022 and 2023 Proxy Statements also failed to disclose that: (1) Project Hestia's intended beneficiaries—disadvantaged homeowners and communities—were victims of the Company's predatory business practices; (2) Sunnova did not have sufficient or effective risk management or compliance controls and procedures in place; (3) as a result, Sunnova faced an

elevated risk of regulatory, civil, and other oversight investigations; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

174.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 and 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 and 2023 Proxy Statement, including but not limited to, the reelection of the Company's directors, and approve, on non-binding advisory basis, the compensation of the Company's named executive officers.

175.     As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders elected Defendants Andrew, Mohamed, and Yang to the Board, allowing them to continue breaching their fiduciary duties to Sunnova and approve, on non-binding advisory basis, the compensation of the Company's named executive officers.

176.     As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders elected Defendants Berger, D'Argenio, and Morgan to the Board, allowing them to continue breaching their fiduciary duties to Sunnova.

177.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statement.

178.     Plaintiff, on behalf of Sunnova, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

179.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sunnova's business and affairs.

181.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

182.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sunnova.

183.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Project Hestia's intended beneficiaries—disadvantaged homeowners and communities—were victims of the Company's predatory business practices; (2) Sunnova did not have sufficient or effective risk management or compliance controls and procedures in place; (3) as a result, Sunnova faced an elevated risk of regulatory, civil, and other oversight investigations; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

184.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

185.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

186.    In yet further breach of their fiduciary duties, during the Relevant Period, four of the Individual Defendants engaged in lucrative insider sales, netting proceeds of ***over $30 million***, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

187.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sunnova's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

188.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

189.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sunnova has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

190.    Plaintiff on behalf of Sunnova has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sunnova.

193.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sunnova that was tied to the performance or artificially inflated valuation of Sunnova, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

194.    Plaintiff, as a shareholder and a representative of Sunnova, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

195.    Plaintiff on behalf of Sunnova has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sunnova, for which they are legally responsible.

198.    As a direct and proximate result of the Individual Defendants' abuse of control, Sunnova has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

199.    Plaintiff on behalf of Sunnova has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

200.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

201.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sunnova in a manner consistent with the operations of a publicly-held corporation.

202.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sunnova has sustained and will continue to sustain significant damages.

203.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

204.    Plaintiff on behalf of Sunnova has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

205.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

207.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Sunnova to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

208.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

209.    Plaintiff on behalf of Sunnova has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Berger and Lane for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    Sunnova, and Defendants Berger and Lane are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants

Berger's and Lane's willful and/or reckless violations of their obligations as officers and/or director of Sunnova.

212.     Defendants Berger and Lane, because of their positions of control and authority as CEO, Chairman, and CFO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sunnova, including the wrongful acts complained of herein and in the Securities Class Action.

213.     Accordingly, Defendants Berger and Lane are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

214.     As such, Sunnova is entitled to receive all appropriate contribution or indemnification from Defendants Berger and Lane.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Sunnova, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sunnova;

(c)     Determining and awarding to Sunnova the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Sunnova and the Individual Defendants to take all necessary

actions to reform and improve Sunnova's corporate governance and internal procedures to comply with applicable laws and to protect Sunnova and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.  a provision to permit the shareholders of Sunnova to nominate at least three candidates for election to the Board;

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)  Awarding Sunnova restitution from Individual Defendants, and each of them;

(f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)  Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 3, 2024               Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*

Saadia Hashmi
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Daniel Thiels, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30 day of April, 2024.

_____
Daniel Thiels